IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LACRESHIA CALDWELL and KATRINA CARTER, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:19-CV-524-RP |
| RICHARD MEDINA, et al., *in their individual and official capacities*, | § § § § | |
| Defendants. | § § | |

## ORDER

Before the Court are Defendants Bryan Collier ("Collier"), Carol Monroe ("Monroe"), Jennifer Cozby ("Cozby"), Mary Comstock ("Comstock"), and Darren Wallace's ("Wallace") amended motion to dismiss, (Dkt. 41), Defendant Mary Basye's ("Basye") amended motion to dismiss, (Dkt. 40); and Defendant Richard Medina's ("Medina") amended motion to dismiss, (Dkt. 42).[1] Plaintiffs LaCreshia Caldwell ("Caldwell") and Katrina Carter ("Carter"; together, "Plaintiffs") filed a combined response, (Dkt. 47); Defendants did not file replies. Plaintiffs also filed a notice of supplemental authority, (Dkt. 52), to which the TDPS Defendants filed a response, (Dkt. 53).

After considering the parties' arguments, the record, and the relevant law, the Court grants in part and denies in part each of Defendants' motions to dismiss.

## I. BACKGROUND

Plaintiffs, two Black women formerly employed by the Texas Department of Criminal Justice ("TDCJ") as correctional officers, allege that Defendants "procur[ed] [their] discharge . . . for exercising their right while off-duty to complain about official misconduct and race-based police

---

[1] The Court refers to Collier, Monroe, Cozby, Comstock, and Wallace together as the "TDCJ Defendants" and to Basye and Medina together as the "TDPS Defendants."

harassment," violating their federal and state constitutional free speech and petition rights. (2d Am. Compl., Dkt. 31-1, at 1–2).[2]

Plaintiffs state that on February 9, 2019, they were carpooling to the TDCJ's Woodman Unit jail, where they worked as correctional officers. (*Id.* at 4). They were in Carter's car with Caldwell driving and were in uniform. (*Id.*; *see also* Pls.' Resp., Dkt. 47, at 11). They passed a TDPS car facing toward them on the other side of the road next to "an active fire." (2d Am. Compl., Dkt. 31-1, at 4). At that moment, Caldwell saw the TDPS car make a U-turn to follow Plaintiffs. (*Id.*). The TDPS car followed Plaintiffs for several minutes and then pulled them over. (*Id.* at 5). Basye got out of the TDPS car, approached Plaintiffs, and told them that "she had stopped their car because Caldwell had failed to turn on her signal when moving into the right lane" and that "[y]ou got every other one, but you missed that one." (*Id.*). Basye also asked Plaintiffs about the TDCJ facility for which they worked. (*Id.*). After telling Caldwell that she planned to write a warning ticket, Basye returned to her car. (*Id.*). When she approached Plaintiffs with the ticket, Carter asked Basye to provide her name and badge number. (*Id.*). Basye did, noting that the information was on the ticket and also giving her supervisor's (Medina) name and phone number. (*Id.* at 5–6).

The stop concluded and Plaintiffs continued driving to work. (*Id.* at 6). They noticed Basye trailing them. (*Id.*). Just before the intersection of Highway 36 and Main Street in Gatesville, Texas, Caldwell made a right turn into a shopping center, and then a left turn toward a restaurant. (*Id.*). Realizing that she and Carter did not have enough time before work to stop for a meal, Caldwell instead continued past the restaurant and turned right, back onto Highway 36. (*Id.*).

Basye again pulled over the car. (*Id.*). She ordered Caldwell to get out of the car and stand near the rear bumper. (*Id.*). Basye told Caldwell that she was giving her a citation for cutting a corner

---

[2] Because, at the motion to dismiss stage, the Court takes all well-pleaded facts as true and views them in the light most favorable to the plaintiff, the following description of events draws on Plaintiffs' account. *See infra* Section II.B.

at the intersection, which Caldwell protested. (*Id.*). Carter got out of the car, said to Caldwell that they could call Basye's supervisor later, and began to record with her cell phone. (*Id.* at 6–7). Caldwell attempted to go back to the driver's seat to retrieve her own phone to call the Woodman Unit about being late to work, but Basye ordered Caldwell to stay where she was. (*Id.* at 7). Both Caldwell and Carter vocally complained to Basye that they felt her actions were illegal and unfair. (*Id.*). Basye called for backup. (*Id.*).

When other officers arrived, Basye explained to them that they were being recorded and gave Caldwell the citation. (*Id.*). Another officer asked Caldwell and Carter who their TDCJ supervisor was. (*Id.*). After Plaintiffs did not answer, Basye said "I got her name; we'll figure it out." (*Id.*). As Caldwell and Carter drove away, Caldwell asked the other officer what he meant; the officer responded that he and Basye could find out who their supervisor was. (*Id.*).

Just over a week later, on February 18, 2019, Caldwell called Medina to lodge a complaint about Basye's conduct, telling Medina that she felt Basye had harassed her and Carter because of their race. (*Id.*). Medina asked Caldwell if Caldwell thought Basye could tell her race when Caldwell drove past, and Caldwell replied that she thought so. (*Id.* at 7–8). Medina and Caldwell set a meeting for February 22, 2019, at which Caldwell could file a formal complaint, bringing Carter as a witness. (*Id.* at 8).

Before that meeting, on February 20, 2019, Medina met with Cozby, the Woodman Unit's warden, in the Woodman Unit's parking lot. (*Id.*). Medina told Cozby that he believed Caldwell and Carter "had behaved unprofessionally during a traffic stop by Defendant Basye, had claimed they were being harassed by the trooper, and that they now wanted to meet with him to complain about the trooper's actions." (*Id.*).

On February 22, 2019, Basye "drafted an 'Interoffice Memorandum' on TDPS letterhead, addressed to the Woodman Unit Warden, detailing her interactions" with Caldwell and Carter,

including that Carter had requested officers' names and badge numbers. (*Id.*). Cozby received this memorandum and referred Caldwell and Carter for discipline, "describing their conduct during the encounter as unprofessional and recalcitrant." (*Id.*).

Also on February 22, 2019, Caldwell rescheduled the meeting with Medina to February 25, 2019. (*Id.*). On February 23, 2019, when Caldwell and Carter arrived at the Woodman Unit, they learned about their referrals for discipline—"a Level One violation, which carries a penalty of dismissal," for violating a TDCJ Rule concerning "On-Duty or Off-[D]uty Conduct." (*Id.* at 8–9). On February 25, 2019, Wallace (a TDCJ warden) met with Caldwell and explained his view of the incident (including his contention that Caldwell had refused Basye's order to get out of the car), asking Caldwell if "she had something 'new to offer.'" (*Id.* at 4, 9). At the end of this brief meeting, Wallace fired her. (*Id.* at 9). Medina then called Caldwell and asked if she still wanted to meet with him, and Caldwell replied that she no longer wished to do so. (*Id.*).

Carter returned to work later after a scheduled absence, and Comstock (a TDCJ warden) conducted a similar meeting with her on March 12, 2019. (*Id.* at 3, 9). Comstock asked Carter why she had asked for Basye's name and badge number, told her "she had no right to question the officer," and asserted that "with everything that's going on today with the media and police officers and all these shootings," she had "put TDCJ in a negative light." (*Id.* at 9). Comstock then fired Carter for unprofessional behavior. (*Id.* at 10).

Caldwell and Carter appealed their firings through an internal mediation process overseen by Monroe (director of TDCJ's Administrative Review & Risk Management Division and regional director of TDCJ's Region VI). (*Id.* at 3, 10). In Caldwell's proceeding, on April 23, 2019, Monroe "said it was the worst display he'd ever seen in TDCJ history of putting on a show for people driving by to see," and when Caldwell stated "that she felt she would not have been fired but for her complaint" to Medina," Monroe responded "I don't know what to tell you." (*Id.* at 10). In Carter's

4

proceeding, also on April 23, 2019, "she explained that she was opposing what she considered to be police misconduct" and Monroe responded that "she had cast TDCJ in a bad light and he could not allow her to keep her job." (*Id.*).

Caldwell and Carter filed their initial complaint in this case on May 15, 2019, bringing claims under 42 U.S.C. § 1983 for free speech violations of the First Amendment and of Article I, § 8 of the Texas Constitution. (Compl., Dkt. 1, at 7). The Court denied Defendants' joint motion to transfer venue to the Waco Division on September 23, 2019. (Mot. Transfer, Dkt. 10; Order, Dkt. 26). The Court granted Plaintiffs' motion to file a second amended complaint on November 25, 2019. (Mot. Amend, Dkt. 31; Order, Dkt. 38; 2d Am. Compl., Dkt. 31-1).[3] Their second amended complaint brings claims under § 1983 for both free speech and petition violations of the First Amendment and of Article I, §§ 8, 27 of the Texas Constitution. (2d Am. Compl., Dkt. 31-1, at 10–14).

Now, each Defendant seeks to dismiss Plaintiffs' second amended complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Rule 12(b)(6). (TDCJ Defs.' Am. Mot. Dismiss, Dkt. 41; Basye Am. Mot. Dismiss, Dkt. 40; Medina Am. Mot. Dismiss, Dkt. 42).

## II.  LEGAL STANDARD

### A.  Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Federal district courts are courts of limited jurisdiction and so may exercise jurisdiction only as the Constitution and federal statutes expressly confer. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for

---

[3] Plaintiffs' second amended complaint was never filed as a separate docket entry. The Court remedies this oversight in this Order. *See infra* Part IV.

lack of subject-matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the Court may consider the complaint alone; the complaint and any undisputed facts in the record; or the complaint, undisputed facts, and the Court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming*, 281 F.3d at 161.

### B.  Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." In deciding a Rule 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the [plaintiffs'] grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The

tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Generally, a court ruling on a Rule 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

### III.  ANALYSIS

### A.  Rule 12(b)(1)

Each Defendant asserts immunity from suit in this case under the Eleventh Amendment. "Eleventh Amendment immunity is jurisdictional in character." *Watson v. Texas*, 261 F.3d 436, 440 n.5 (5th Cir. 2001). The TDCJ Defendants claim immunity because "the Texas Constitution does not waive Eleventh Amendment immunity for a free speech claim brought in federal court," like the one Plaintiffs assert. (TDCJ Defs.' Am. Mot. Dismiss, Dkt. 41, at 4). The TDPS Defendants, meanwhile, argue that they are immune because they are sued in their official capacities and because they lack the power to reinstate Plaintiffs to their TDCJ positions. (Basye's Mot. Dismiss, Dkt. 40, at 12; Medina's Mot. Dismiss, Dkt. 42, at 9). The Court considers each set of Defendants' arguments (and Plaintiffs' responses) in turn.

#### 1.  TDCJ Defendants

The TDCJ Defendants assert that "because the Texas Constitution does not waive Eleventh Amendment immunity for a free speech claim brought in federal court," the Eleventh Amendment also bars all of Plaintiffs' claims against them in their official and individual capacities. (TDCJ Defs.' Am. Mot. Dismiss, Dkt. 41, at 4). The Court disagrees, finding that Plaintiffs' federal-law claims may proceed against the TDCJ Defendants in both their official and individual capacities. Plaintiffs' state-

law claims may proceed against the TDCJ Defendants, but only in their individual capacities, and only for nonmonetary relief.

### a.   Federal-Law Claims

#### i.   *Official Capacities*

The Eleventh Amendment typically deprives federal courts of jurisdiction over "suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014); *see also Cozzo v. Tangipahoa Par. Council—President Gov't*, 279 F.3d 273, 280–81 (5th Cir. 2002) ("When a state agency is the named defendant, the Eleventh Amendment bars suits for both money damages and injunctive relief unless the state has waived its immunity."). However, under the *Ex parte Young* exception, lawsuits may proceed in federal court when a plaintiff requests prospective relief against state officials in their official capacities for ongoing federal violations. 209 U.S. 123, 159–60 (1908); *see also Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020) ("There are three basic elements of an *Ex parte Young* lawsuit. The suit must: (1) be brought against state officers who are acting in their official capacities; (2) seek prospective relief to redress ongoing conduct; and (3) allege a violation of federal, not state, law."); *Corn v. Mississippi Dep't of Pub. Safety*, 954 F.3d 268, 274 (5th Cir. 2020).

Plaintiffs seek "declaratory relief and/or injunctive relief requiring [the TDCJ Defendants] to reinstate them to their former positions of employment" with TDCJ. (2d Am. Compl., Dkt. 31-1, at 14). The Fifth Circuit has repeatedly held that "a request for reinstatement is sufficient to bring a case within the *Ex parte Young* exception to Eleventh Amendment immunity, as it is a claim for prospective relief designed to end a continuing violation of federal law." *Nelson v. Univ. of Texas at Dallas*, 535 F.3d 318, 324 (5th Cir. 2008); *see also, e.g., Corn*, 954 F.3d at 276; *Jones v. Texas Juvenile Justice Dep't*, 646 F. App'x 374, 376–77 (5th Cir. 2016); *Sternadel v. Scott*, 254 F.3d 1080, 2001 WL

563628, at *2 (5th Cir. 2001) (holding that *Ex parte Young* applied "because of the very nature of the relief [plaintiff] sought—reinstatement to her job as a parole officer in the TDCJ"). Here, as in those cases, the nature of the relief Plaintiffs seek permits their First Amendment (i.e., federal-law) claims against the TDCJ Defendants in their official capacities to go forward. This is not a case in which, for instance, the positions to which they seek to be reinstated no longer exist, causing "principles of equitable relief" to militate against claims seeking reinstatement. *Anderson v. Valdez,* 913 F.3d 472, 479 (5th Cir.), *reh'g denied,* 916 F.3d 404 (5th Cir. 2019) ("*Anderson II*").

ii.  *Individual Capacities*

In their Rule 12(b)(1) motion, the TDCJ Defendants do not explicitly challenge Plaintiffs' federal-law claims against them in their individual capacities on sovereign immunity grounds (though they later challenge these claims on qualified immunity grounds). (*See* TDCJ Defs.' Am. Mot. Dismiss, Dkt. 41, at 3–4). Still, the Court notes that sovereign immunity does not prevent Plaintiffs from asserting these claims against the TDCJ Defendants. *See generally Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019) (courts should consider subject-matter jurisdiction sua sponte). "[S]overeign immunity 'does not erect a barrier against suits to impose individual and personal liability.'"[4] *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017) (quoting *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991)); *see also Crane v. State of Texas*, 759 F.2d 412, 428 n.17 (5th Cir.) ("The Eleventh Amendment is obviously no bar to actions for damages against officials sued in their individual capacities."), *amended on denial of reh'g*, 766 F.2d 193 (5th Cir. 1985). Accordingly, Plaintiffs' federal-law claims against the TDCJ Defendants in their individual capacities may proceed.

---

[4] While "[d]efendants in an official-capacity action may assert sovereign immunity," "[a]n officer in an individual-capacity action . . . may be able to assert *personal* immunity defenses." *Lewis*, 137 S. Ct. at 1291. Defendants do so in the Rule 12(b)(6) portions of their motions to dismiss. *See infra* Section III.B.2.

b.  State-Law Claims

i.  *Official Capacities*

However, the TDCJ Defendants are correct that sovereign immunity bars Plaintiffs' claims against them, in their official capacities, for violations of the Texas Constitution. (*See* TDCJ Defs.' Am. Mot. Dismiss, Dkt. 41, at 3 (citing *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995))). In *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984), the Supreme Court "held that sovereign immunity barred federal courts from hearing state-law claims brought in federal court against state entities and state officers sued in their official capacities, including claims for injunctive relief under state law." *Kermode v. Univ. of Mississippi Med. Ctr.*, 496 F. App'x 483, 490 (5th Cir. 2012); (*see* TDCJ Defs.' Am. Mot. Dismiss, Dkt. 41, at 4). The TDCJ Defendants contend that *Pennhurst* flatly prohibits Plaintiffs from bringing state-law claims against the TDCJ Defendants in their official capacities in federal court, as they do here. (TDCJ Defs.' Am. Mot. Dismiss, Dkt. 41, at 4; *see* 2d Am. Compl., Dkt. 31-1, at 13–14). They are correct: when, as here, "litigants accuse state officers of violating state common law when acting in the course and scope of their employment, the Eleventh Amendment prevents the litigant from raising the claim in federal court whether the litigant seeks damages or injunctive relief . . . and whether the litigant invokes the court's original or pendent jurisdiction." *Hughes v. Savell*, 902 F.2d 376, 378 (5th Cir. 1990); *see also Corn*, 954 F.3d at 275; *Martinez v. McLane*, 792 F. App'x 282, 287 (5th Cir. 2019). Therefore, Plaintiffs may not pursue claims for violations of the Texas Constitution against the TDCJ Defendants in their official capacities.

ii.  *Individual Capacities*

Moreover, Plaintiffs may not seek damages for violations of the Texas Constitution from the TDCJ Defendants in their individual capacities. *See Bouillion*, 896 S.W.2d at 147–49 (holding that "there is no implied private right of action for damages arising under the free speech and free

assembly sections of the Texas Constitution."). Plaintiffs, acknowledging the rule expressed in *Bouillion*, describe their state-law claims against the TDCJ Defendants in their official capacities as "limited to appropriate equitable relief." (Pls.' Resp., Dkt. 47, at 5 n.1). The Court agrees with Plaintiffs' self-described limitation of their claims, finding that while *Bouillion* does foreclose them from seeking damages in this context, it does not preclude the availability of injunctive or equitable relief. *See Crampton v. Weizenbaum*, 757 F. App'x 357, 363 n.5 (5th Cir. 2018) (citing *Bouillion*, 896 S.W.2d at 149) (noting that because "Texas has no § 1983 analog," the plaintiff's claim for violations of the Texas Constitution was "limited to injunctive relief").

Even so, Plaintiffs may seek declaratory, injunctive, and/or equitable relief from the TDCJ Defendants, in their individual capacities, for violations of the Texas Constitution—even if, at this stage of the case, the precise nature that relief could take is uncertain. The TDCJ Defendants contend that because they cannot, in their individual capacities, provide certain prospective injunctive relief (including reinstatement) that Plaintiffs seek, they may assert sovereign immunity against these claims. But it is "[t]he identity of the real party in interest," not the availability of specific remedies, that "dictates what immunities may be available." *Lewis*, 137 S. Ct. at 1291. And "*Pennhurst* and the Eleventh Amendment do not deprive federal courts of jurisdiction over state-law claims against state officials strictly in their individual capacities." *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1271 (5th Cir. 1992).

Here, all of the TDCJ Defendants except for Collier are explicitly sued in their individual capacities. (2d Am. Compl., Dkt. 31-1, at 3–4); *cf. Voisin's Oyster House, Inc. v. Guidry*, 799 F.2d 183, 187 (5th Cir. 1986) (barring suit when "plaintiffs did not dispute that the suit was against Guidry in his official capacity only"). Damages are unavailable for these claims, so this is not a case in which the TDCJ Defendants would "run to the state treasury" if Plaintiffs prevail. *Reyes v. Sazan*, 168 F.3d 158, 162 (5th Cir. 1999). And this is not a case in which the defendants are sued under a state tort

claims act, such as the Texas Tort Claims Act, which waives sovereign immunity for government officials acting within the scope of their employment. *See* Tex. Civ. Prac. & Rem. Code. §§ 101.021, 101.125; *cf. Corn*, 954 F.3d at 275 (holding that a state-law wrongful discharge claim was barred by the state tort claims act). Instead, "[t]he [Texas constitutional] provisions sued upon are statutes of general applicability, not provisions specifically concerning conduct of government officers," so suing the TDCJ Defendants in their individual capacities is possible. *Reyes*, 168 F.3d at 162; *cf. Hughes*, 902 F.2d at 379 (state prison guard's negligence was necessarily imputed to the state under state tort law, so he could only be sued in his official capacity). Thus, neither *Pennhurst* nor the Eleventh Amendment prevent Plaintiffs from advancing claims for violations of the Texas Constitution against the TDCJ Defendants in their individual capacities and seeking nonmonetary relief.

Should Plaintiffs ultimately prevail on these claims, the Court will fashion an appropriate and legally permissible remedy. *See generally Sealed Appellant v. Sealed Appellee*, 130 F.3d 695, 698 (5th Cir. 1997); *United States v. Ugalde*, 861 F.2d 802, 810 (5th Cir. 1988) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803)) ("We must ensure that for every right there is a remedy."). It may very well be true, as the TDCJ Defendants argue, that they can do nothing in their individual capacities to effectuate the injunctive relief for which Plaintiffs pray at this stage. But Plaintiffs also request declaratory and general equitable relief, and at least the former is capable of being granted against the TDCJ Defendants in their individual capacities. To be clear, the Court recognizes the tension that the TDCJ Defendants identify, and agrees to some extent that it is indeed a tension. Still, the potential or even likely unavailability of a preferred form of relief does not, by itself, justify the assertion of sovereign immunity when it would otherwise be unwarranted.

### 2.  The TDPS Defendants

Plaintiffs sued the TDPS Defendants in their official capacities "for prospective injunctive relief only" and in their individual capacities for "declaratory, injunctive, and equitable relief; for damages; and for other relief cognizable under 42 U.S.C. § 1983." (2d Am. Compl., Dkt. 31-1, at 2–3). The Court finds that Plaintiffs' federal-law claims may proceed against the TDPS Defendants in their individual capacities only. Plaintiffs' state-law claims may proceed against the TDPS Defendants, but only in their individual capacities, and only for nonmonetary relief.

### a.  Federal-Law Claims

### i.  *Official Capacities*

First, the Court evaluates whether sovereign immunity bars Plaintiffs' federal-law claims against the TDPS Defendants in their official capacities. Plaintiffs specifically seek "injunctive relief prohibiting [the TDPS Defendants] . . . from any future acts of retaliation or harassment for Plaintiffs' exercise of protected First Amendment and related State Constitutional rights." (*Id.* at 16–17). The TDPS Defendants argue that Plaintiffs cannot identify an ongoing federal constitutional violation that would satisfy *Ex parte Young*'s requirements. (Basye's Mot. Dismiss, Dkt. 40, at 12; Medina's Mot. Dismiss, Dkt. 42, at 9). The Court agrees.

"The *Ex parte Young* exception is 'focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past.'" *Williams*, 954 F.3d at 737 (quoting *Papasan v. Allain*, 478 U.S. 265, 277–78 (1986)). Consequently, "[p]laintiffs must allege that 'the defendant *is violating* federal law, not simply that the defendant has done so' at some point in the past," to bring their claims within *Ex parte Young*'s ambit. *Id.* at 738 (quoting *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015)).

Here, Plaintiffs do not allege that the TDPS Defendants are engaged in an ongoing violation of federal law. They instead contend that because the Court has the ability to craft prospective injunctive relief after discovery, their claims may go forward. (Pls.' Resp., Dkt. 47, at 5). But this argument puts the cart before the horse: to achieve injunctive relief at all on claims against state officials in their official capacities, Plaintiffs must first jump the hurdle of pleading an ongoing violation of federal law. They have not. Thus, the Eleventh Amendment bars their federal-law claims against the TDPS Defendants in their official capacities.

## ii. *Individual Capacities*

Second, the Court turns to Plaintiffs' federal-law claims against the TDPS Defendants in their individual capacities. For the reasons discussed *supra* in Section III.A.1.a.ii, sovereign immunity does not bar these claims.

## b. State-Law Claims

Third, for the reasons discussed *supra* in Sections III.A.1.b.i and ii, Plaintiffs' state-law claims against the TDPS Defendants in their official capacities are barred, but Plaintiffs' state-law claims against the TDPS Defendants in their individual capacities may proceed for nonmonetary relief only.

## B. Rule 12(b)(6)

### 1. The Attached Recordings

The Court initially confronts a threshold issue. Basye and Medina each included the same recordings from Basye's body and dashboard cameras as exhibits to their motions to dismiss. (Body Camera Recording, TDPS Defs.' Ex. 1, Dkt. 40-1, 42-1; Dashboard Camera Recording, TDPS Defs.' Ex. 2, Dkt. 40-2, 42-2). They filed the recordings separately, rather than as exhibits to an affidavit from a custodian of records or a person in a similar role. Plaintiffs challenge the admissibility of these recordings at the motion to dismiss stage and point out that the recordings are not authenticated. (Pls.' Resp., Dkt. 47, at 12).

Federal Rule of Civil Procedure 12(d) provides that on a motion under Rule 12(b)(6), when a party presents "matters outside the pleadings" that "are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." But "federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Arthur R. Miller, et al., *Federal Practice and Procedure* § 1366 (3d ed. Apr. 2020 update). If the court decides not to accept the external evidence and convert the motion to dismiss into a motion for summary judgment, it may still consider these attachments or exhibits as "[p]art of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim," a conjunctive standard. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). In that case, when the opposing party challenges the exhibits for lack of authentication, but does not challenge their substantive validity, the exhibits may be considered despite their proponent's failure to comply with evidentiary rules. *See, e.g.*, *Borders v. Chase Home Fin. L.L.C.*, No. CIV.A. 09-3020, 2009 WL 1870916, at *4 (E.D. La. June 29, 2009) (citing *Wilson v. Kimberly–Clark Corp.*, 254 Fed. App'x 280, 285–86 (5th Cir. 2007)); *Berry v. Indianapolis Life Ins. Co.*, 600 F. Supp. 2d 805, 811–12 (N.D. Tex. 2009).

Here, the Court exercises its discretion to decline to consider the recordings at this stage. The Court's task when considering a motion to dismiss under Rule 12(b)(6) is to evaluate the sufficiency of the pleadings and determine whether they indeed state plausible claims at a preliminary stage of the litigation, contrasting with the Court's imperative on a motion for summary judgment. *Compare Iqbal*, 556 U.S. at 678 (discussing motions to dismiss), *with Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (discussing motions for summary judgment). Moreover, neither Plaintiffs nor Defendants request for the motions to dismiss to be converted into motions for summary judgment, and the Court's independent, sua sponte decision to do so would have to be

exercised "with great caution and attention to the parties' procedural rights." Miller, et al., *supra*, at § 1366.

While Plaintiffs refer to the recordings in their complaint, (*see* 2d Am. Compl., Dkt. 31-1, at 8–10), the recordings are not central to their claims. The recordings depict only some of the conduct of which Plaintiffs complain; in fact, the most consequential and germane conduct by Defendants that Plaintiffs allege is not captured. Video recordings alter the typical summary judgment standard, *see Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013); *Garcia v. City of Buda*, No. 1:17-CV-377-RP, 2018 WL 6682419, at *3 (W.D. Tex. Dec. 19, 2018), but they do not have the same effect at the motion to dismiss stage, at which the Court is to evaluate the sufficiency of the plaintiff's pleading and the allegations it contains, not the sufficiency of the evidentiary record prior to discovery, *see Iqbal*, 556 U.S. at 678. Thus, the Court will neither consider the recordings nor convert the TDPS Defendants' motions to dismiss into motions for summary judgment.[5] The TDPS Defendants are free to file motions for summary judgment, attaching the recordings in a manner that renders them competent summary judgment evidence, at a later stage in the case.

### 2.  Qualified Immunity

Each Defendant asserts that they are entitled to qualified immunity on Plaintiffs' federal-law claims against them in their individual capacities. (TDCJ Defs.' Am. Mot. Dismiss, Dkt. 41, at 5–10; Basye's Mot. Dismiss, Dkt. 40, at 15–20; Medina's Mot. Dismiss, Dkt. 42, at 15–20). The Court disagrees, finding that no Defendant is entitled to qualified immunity.

Generally, "[t]he doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v.*

---

[5] The Court does not reach the issue of whether the unauthenticated recordings are competent evidence, but notes that Plaintiffs do not challenge their substance. (*See* Pls.' Resp., Dkt. 47, at 13).

*Swanson*, 659 F.3d 359, 370 (5th Cir. 2011); *see also Malley v. Briggs*, 475 U.S. 335, 344–45 (1986) (qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law"). Courts generally carry out two steps when determining whether a defendant is protected by qualified immunity. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The court asks whether the official "violated a statutory or constitutional right" and whether "the right was 'clearly established' at the time of the challenged conduct." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). While the Supreme Court used to "*require* courts considering qualified immunity claims to first address the constitutional question, so as to promote 'the law's elaboration from case to case,'" *Camreta v. Greene*, 563 U.S. 692, 707 (2011), it now cautions that that "lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim," *D.C. v. Wesby*, 138 S. Ct. 577, 589 n.7 (2018) (quoting *Camreta*, 563 U.S. at 707). Instead, lower courts are encouraged, though not strictly required, to review whether the right was clearly established before proceeding to evaluate a putative constitutional violation. *Id.* at 589 & n.7; *see also Pearson v. Callahan*, 555 U.S. 223, 236–42 (2009). *But cf. Camreta*, 563 U.S. at 707 ("It remains true that following the two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials."). Here, following this guidance, the Court will begin its analysis with the "clearly established" step.

### a. Clearly Established Right

For a right to be "clearly established," the law must have been "sufficiently clear" at the time of the challenged conduct such that "every 'reasonable official would understand that what he is doing' is unlawful. *Wesby*, 138 S. Ct. at 589 (quoting *al-Kidd*, 563 U.S. at 741). The legal principle at issue "must have a sufficiently clear foundation in then-existing precedent"; "[i]n other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). "The precedent must be clear enough that every reasonable

official would interpret it to establish the particular rule the plaintiff seeks to apply," and the rule must "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590. The latter circumstantial determination "requires a high 'degree of specificity'": "if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established,'" then the rule is too general to bar qualified immunity. *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015); *Anderson v. Creighton*, 483 U.S. 635, 640–41 (1987)).

So, "[d]etermining whether [Plaintiffs] have alleged a violation of a clearly established right involves an application of constitutional standards as they existed at the time of the alleged violation." *Alexander v. Eeds*, 392 F.3d 138, 144 (5th Cir. 2004). "In this case, the standard is that of retaliation for speech protected by the First Amendment under § 1983." *Id.* "To establish a § 1983 claim for employment retaliation related to speech, a plaintiff-employee must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016) ("*Anderson I*").

Here, the parties do not dispute that Plaintiffs suffered an adverse employment action or that Plaintiffs' speech precipitated their firing.[6] The Court thus analyzes the other two elements in turn.

### i. *Ordinary Citizens or Government Employees*

To determine whether Plaintiffs spoke as citizens on a matter of public concern, the Court examines whether they spoke "pursuant to [their] official duties," which in turn hinges on if they spoke "in a course of conduct subject to the employer's control." *Anderson I*, 845 F.3d at 596. "If the

---

[6] In any case, Plaintiffs allege facts that allow the factfinder to infer a causal connection between their protected speech and their firing. *See Alexander*, 392 F.3d at 146.

employer was entitled to exercise such control, the speech is made pursuant to the employee's official duties; if the employer was not entitled to exercise such control, the speech is not made pursuant to the employee's official duties." *Id.*; *see also Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006) ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.").

The Fifth Circuit has identified a number of factors relevant to this inquiry. Courts may consider whether the person spoke "during working hours" or was "in uniform" while speaking. *Gibson v. Kilpatrick*, 773 F.3d 661, 672 (5th Cir. 2014). They may also scrutinize "job descriptions, whether the employee communicated with coworkers or with supervisors, whether the speech resulted from special knowledge gained as an employee, and whether the speech was directed internally or externally." *Johnson v. Halstead*, 916 F.3d 410, 422 (5th Cir. 2019). The final factor can be crucial, as courts are to "look to the identity of the listener": "[c]omplaints made publicly or to individuals outside the speaker's organization suggest the employee is acting as a citizen," as opposed to as a government employee. *Id.* If a government employee spoke "'externally' concerning 'an event that was not within [her] job requirements,'" she is entitled to First Amendment protection. *Anderson I*, 845 F.3d at 600 (quoting *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 472–73 (5th Cir. 2014)).

Taking Plaintiffs' allegations as true, as the Court must at this stage of the litigation, Plaintiffs have alleged exactly what the Fifth Circuit requires. *See id.* First, Plaintiffs alleged that they complained to Basye and then reported their concerns about Basye's conduct to Medina—that is, spoke externally, outside of TDCJ. *See id.* Second, Plaintiffs allege that their complaints to Basye and report to Medina were not part of their job duties. *See id.* at 600–01. The Fifth Circuit has considered these allegations alone to dispose of the ordinary citizen/government employee issue at the motion

to dismiss stage. *Id.* at 601. The fact that Plaintiffs happened to have been wearing their uniforms during the stop—while they were not on duty—is of little to no import, despite Defendants' arguments to the contrary. (*See* TCDJ Defs.' Am. Mot. Dismiss, Dkt. 41, at 6; Basye's Mot. Dismiss, Dkt. 40, at 17; Medina's Mot. Dismiss, Dkt. 42, at 17). Indeed, Caldwell alleges that during the second traffic stop, she attempted to retrieve her phone to call the Woodman Unity about being late to work, strongly implying that she and Carter were not yet acting in their capacities as government employees. (2d Am. Compl., Dkt. 31-1, at 7; *see also* Pls.' Resp., Dkt. 47, at 11 n.4 (noting that TDCJ employees are not paid for their time or reimbursed for their expenses related to commuting)). After all, Plaintiffs did not speak during working hours, their speech did not draw on any special knowledge they obtained as employees, and the conduct about which they complained had no connection to their official responsibilities.

As a result, Plaintiffs have satisfactorily pleaded, for purposes of the motions to dismiss, that they spoke as ordinary citizens. And they have also pleaded facts indicating that they spoke about a matter of public concern. *See Charles v. Grief*, 522 F.3d 508, 514 (5th Cir. 2008) ("It is well-established . . . that speech relating to official misconduct or racial discrimination almost always involves matters of public concern."); *see also Kinney v. Weaver*, 367 F.3d 337, 369 (5th Cir. 2004); *Brawner v. City of Richardson, Texas*, 855 F.2d 187, 191–92 (5th Cir. 1988).[7]

Each Defendant contends that *Nixon v. City of Houston*, 511 F.3d 494 (5th Cir. 2007) applies to the situation this case presents. (*See* TCDJ Defs.' Am. Mot. Dismiss, Dkt. 41, at 7–8; Basye's Mot. Dismiss, Dkt. 40, at 17–18; Medina's Mot. Dismiss, Dkt. 42, at 17–18). In *Nixon*, the Fifth Circuit held that the plaintiff, a police officer, spoke as a government employee when he made unauthorized

---

[7] "The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department. Because the speech at issue complained of misconduct within the police department, it should be classified as speech addressing a matter of public concern."

statements to the media while on duty at the scene of an accident. 511 F.3d at 496–97. *Nixon* is readily distinguishable from this case. "Nixon's statement was made while he was performing his job." *Id.* at 499. "Nixon spoke to the media while on duty, in uniform, and while working at the scene of the accident"; "[h]is statement was intended to inform the public;" and "speaking with the media is arguably one of an officer's job responsibilities." *Id.* at 498–99. By contrast, in this case, though Plaintiffs were in uniform, they were not on duty and their speech was not part of their official responsibilities. As a result, *Nixon* does not affect the analysis in this case.

Each Defendant also effectively argues that because TDCJ deemed Plaintiffs' speech to have violated its policy prohibiting "unprofessional" conduct, Plaintiffs must have spoken as government employees. (*See* TDCJ Defs.' Am. Mot. Dismiss, Dkt. 41, at 8; Basye's Mot. Dismiss, Dkt. 40, at 18; Medina's Mot. Dismiss, Dkt. 42, at 17). This reasoning is unavailing. For purposes of this case, the determination of whether Plaintiffs spoke as ordinary citizens or as government employees is a legal question—one for the Court or ultimately the jury, not TDCJ, to decide. Besides, Plaintiffs question TDCJ's professionalism determination in the first place, so to assume its validity would be to improperly vitiate Plaintiffs' claims at this early stage of the litigation.

ii. *Balance of Interests*

Plaintiffs have sufficiently alleged that Defendants' interests "in promoting the efficiency of the public services [they] perform[]" do not outweigh Plaintiffs' interests, "as . . . citizen[s], in commenting upon matters of public concern." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 568 (1968). In this analysis, "[t]he state interest considerations focus on the 'effective functioning of the public employer's enterprise.'" *Branton v. City of Dallas*, 272 F.3d 730, 741 (5th Cir. 2001) (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Rankin*, 483 U.S. at 388.

"However, real, not imagined, disruption is required, and the 'close working relationship' exception cannot serve as a pretext for stifling legitimate speech or penalizing public employees for expressing unpopular views." *McKinley v. City of Eloy*, 705 F.2d 1110, 1115 (5th Cir. 1983). Here, Plaintiffs have asserted that they were off-duty while speaking and that "there is no indication that the Plaintiffs' actions at the stops, and in reporting the stops, had any deleterious effect on their work or working relationships." (Pls.' Resp., Dkt. 47, at 13); *see McKinley*, 705 F.2d at 1115. Defendants' arguments to the contrary reveal no distinct effect on TDCJ's internal cohesion or ability to function, failing to tip the balance the other way. (*See, e.g.*, TDCJ Defs.' Am. Mot. Dismiss, Dkt. 41, at 9–10; Basye's Mot. Dismiss, Dkt. 40, at 18; Medina's Mot. Dismiss, Dkt. 42, at 18).

b.  Objectively Reasonable

"Since [Plaintiffs have] successfully alleged a violation of a clearly established right, the final question is whether this right existed at the time of the violation so that Defendants' alleged behavior may be deemed objectively unreasonable." *Alexander*, 392 F.3d at 146. The Court finds that the right did exist at the time of the alleged violations in this case. Existing law placed the constitutionality of Defendants' conduct beyond debate. *See, e.g.*, *id.* at 147 ("Reporting serious police misconduct or corruption is an activity with well-established protections."); *Branton*, 272 F.3d at 744 (concluding in 2001 that "for at least thirty-four years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression"). In general, the ability to verbally criticize police officers and challenge their conduct is a sufficiently specific clearly established right. *See City of Houston, Texas v. Hill*, 482 U.S. 451, 461–63 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. . . . The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."); *Enlow v. Tishomingo Cty., Miss.*, 962 F.2d 501,

509 (5th Cir. 1992) (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949)) (the First Amendment

protects speech to police officers that does not "rise above 'inconvenience, annoyance, or unrest' . . .

or constitute an incitement to immediate lawless action"); *see also, e.g.*, *Mesa v. Prejean*, 545 F.3d 264,

273 (5th Cir. 2008) (applying *Enlow*); *Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 165–66 (5th

Cir. 1997). Similarly, the right to record police officers as they perform their official duties is clearly

established. *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (determining it to have been

clearly established that "First Amendment principles, controlling authority, and persuasive precedent

demonstrate that a First Amendment right to record the police does exist, subject only to reasonable

time, place, and manner restrictions"); *see also Buehler v. City of Austin/Austin Police Dep't*, No. A-13-

CV-1100 ML, 2014 WL 12776539, at *8–10 (W.D. Tex. July 24, 2014) (collecting cases). So, too, is

speaking to a police supervisor to make an official complaint about police conduct after that

conduct occurred. *See, e.g.*, *Alexander*, 392 F.3d at 147 ("Reporting serious police misconduct or

corruption is an activity with well-established protections."). And as of June 2018, it was clearly

established in the Fifth Circuit that someone who does not make a final employment decision can

nevertheless be liable for First Amendment retaliation. *Sims v. City of Madisonville*, 894 F.3d 632, 639–

41 (5th Cir. 2018); *see also Bevill v. City of Quitman, Texas*, No. 4:19-CV-406, 2020 WL 1065430, at *9–

10 (E.D. Tex. Mar. 5, 2020) (discussing *Sims*).

  In light of these precedents, the Court concludes that at the time of the events in question,

the law was sufficiently clear that every reasonable official would have understood that her conduct

was unlawful. *See Wesby*, 138 S. Ct. at 589. Accordingly, no Defendant is entitled to qualified

immunity on any of Plaintiffs' claims.

### c.  Rule 7 Reply

  The TDPS Defendants urge the Court to require Plaintiffs to file an immunity-focused reply

under Federal Rule of Civil Procedure 7 to clarify their First Amendment claims and the applicable

facts they have pleaded. (*See* Basye's Mot. Dismiss, Dkt. 40, at 19–20; Medina's Mot. Dismiss, Dkt. 42, at 19–20). The Court disagrees that such a filing would aid in reaching a decision on Defendants' motions to dismiss.

The Fifth Circuit has specified that "the court may, in its discretion, insist that a plaintiff file a [Rule 7] reply tailored to an answer pleading the defense of qualified immunity." *Schultea v. Wood*, 47 F.3d 1427, 1433–34 (5th Cir. 1995). "[V]indicating the immunity doctrine will ordinarily require such a reply, and a district court's discretion not to do so is narrow indeed when greater detail might assist." *Id.* at 1434. At the motion to dismiss stage, "[t]he district court need not allow any discovery unless it finds that plaintiff has supported his claim with sufficient precision and factual specificity to raise a genuine issue as to the illegality of [the defendants'] conduct at the time of the alleged acts." *Id.* If the district court finds that the plaintiff has "met his burden to negate the defense of qualified immunity because he ha[s] alleged sufficient facts in the short and plain statement that *Schultea* initially requires"—i.e., the complaint—a tailored reply addressing qualified immunity is unnecessary. *Cox v. Kaelin*, 577 F. App'x 306, 313 (5th Cir. 2014).

The Court finds that here, Plaintiffs have already supported their claims with sufficient precision and factual specificity for the issue of qualified immunity to be addressed, rendering a Rule 7 reply unnecessary. Their second amended complaint, the operative pleading at this stage, contains specific descriptions of each Defendant's allegedly unlawful conduct and the rights that each Defendant allegedly violated, including those Defendants in supervisory roles. (*See* 2d Am. Compl., Dkt. 31-1, at 7–8, 11, 13 (Basye); *id.* at 8, 11–13 (Medina); *id.* at 8, 12–13 (Cozby); *id.* at 9, 11–13 (Wallace); *id.* at 9–13 (Comstock); *id.* at 10–13 (Monroe); *id.* at 12–13 (Collier)); *cf. Reyes*, 168 F.3d at 161 (holding that Rule 7 reply was required when "[p]laintiffs did not allege their claims against the supervisory defendants with particularity"). For the reasons discussed *supra* in Sections III.2.a and b, "it is plausible from the facts alleged that [Defendants] violated a clearly established constitutional

right and [their] conduct was objectively unreasonable," obviating the need for a Rule 7 reply. *Cox*, 577 F. App'x at 313.

## IV.  CONCLUSION

For the reasons discussed above, **IT IS ORDERED** that the TDCJ Defendants' amended motion to dismiss, (Dkt. 41), is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' federal-law claims may proceed against the TDCJ Defendants in both their official and individual capacities. Plaintiffs' state-law claims may proceed against the TDCJ Defendants, but only in their individual capacities, and only for nonmonetary relief. At this stage, the Court finds that the TDCJ Defendants have not shown that they are entitled to qualified immunity on any of Plaintiffs' remaining claims.

**IT IS FURTHER ORDERED** that Basye's amended motion to dismiss, (Dkt. 40), and Medina's amended motion to dismiss, (Dkt. 42), are each **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' federal-law claims may proceed against the TDPS Defendants in their individual capacities only. Plaintiffs' state-law claims may proceed against the TDPS Defendants, but only in their individual capacities, and only for nonmonetary relief. At this stage, the Court finds that the TDPS Defendants have not shown that they are entitled to qualified immunity on any of Plaintiffs' remaining claims.

**IT IS FINALLY ORDERED** that the Clerk shall **FILE** Plaintiffs' second amended complaint, (Dkt. 31-1), as a separate docket entry.

**SIGNED** on July 17, 2020.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE